UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

EUGENE A. MANGIERI, M.D.,          ]
                                   ]
        Plaintiff(s),              ]
                                   ]
vs.                                ]        CV-00-N-0551-W
                                   ]
DRUID CITY HOSPITAL                ]
HEALTHCARE AUTHORITY, et al.,      ]
                                   ]
        Defendant(s).              ]

**ENTERED**

MAY 3 1 2001

### Memorandum of Opinion

## I.     Introduction

The plaintiff, Eugene A. Mangieri, M.D. ("Dr. Mangieri"), brings this action against

DCH Healthcare Authority (the "Authority") and its officers, Bryan N. Kindred ("Kindred"),

Charles Stewart ("Stewart") and William Cassels ("Cassels"), and Alabama Orthopedic &

Spine Center of Tuscaloosa, P.C. ("AOSC") and its shareholders, Bony Barrineau, M.D.

("Dr. Barrineau"), William Sudduth, M.D. ("Dr. Sudduth"), Timothy Bassett, M.D. ("Dr.

Bassett"), William Krauss, D.O. ("Dr. Krauss"), and William Montiel, M.D. ("Dr. Montiel"),

to obtain redress for what he characterizes as a deprivation of certain federal rights, as well

as violations of the laws of the state of Alabama.[1]

The cause is presently before the court on the motions of all defendants for summary

judgment. (Doc. #'s 44 & 49). The issues have been briefed by the parties and are now

---

[1] In his responsive submission, the plaintiff concedes that summary judgment is due to be granted as to all claims asserted against Dr. Montiel. (Plf's Response at p. 22, n. 1). Similarly, the plaintiff has indicated that, in light of the Alabama Supreme Court's decision in *Tomlinson v. Humana, Inc.*, 495 So. 2d 630 (Ala. 1986), he does not intend to pursue his claims premised upon Ala. Code § 8-1-1 (1975, as amended). (*Id.*).

ripe for decision.  After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court finds that:

- The motion of defendant DCH Healthcare Authority for summary judgment is due to be granted as to plaintiff's § 1983 claim and that claim will be dismissed with prejudice.

- The plaintiff's § 1983 claims against defendants Kindred, Stewart and Cassels, in their official capacities as officers of DCH Healthcare Authority are redundant and, therefore, are due to be dismissed with prejudice.

- The motion of defendant Alabama Orthopedic and Spine Center and its shareholders for summary judgment is due to be granted as to plaintiff's § 1983 claims and those claims will be dismissed with prejudice.

- On plaintiff's motion for voluntary dismissal, the state law claims premised upon Ala. Code § 8-1-1 will be dismissed with prejudice.

- The plaintiff's state law claim against defendant Alabama Orthopedic and Spine Center and its shareholders for intentional interference with business relations will be dismissed without prejudice to the right of plaintiff to reassert such claim in the courts of the State of Alabama.

## II.   Statement of Facts[2]

The facts, as garnered from the affidavits and deposition testimony submitted by the parties but viewed in a light most favorable to the plaintiff, are as follows:

DCH Northport Medical Center ("DCH Northport") is a general hospital located in Northport, Alabama.  DCH Regional Medical Center is a general hospital located just across the Black Warrior river in the neighboring city of Tuscaloosa.  The Authority is a public

---

[2]In developing the statement of facts in this opinion, the court considered the facts proposed by the parties and the court's own examination of the evidentiary record.  These are the "facts" for purposes of this opinion only.  They may not be the actual facts.  *Cox v. Administrator United States Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994), *cert. denied*, *USX Corp. v. Cox*, 114 S. Ct. 900 (1995).

corporation organized pursuant to the Health Care Authorities Act of 1982. (DCH Ex. A, Kindred Aff. at ¶ 3; Ala. Code § 22-21-310, *et seq*. (1997)). At all times relevant to this action, the Authority has owned, and has operated as public hospitals, both DCH Northport and DCH Regional Medical Center. (DCH Ex. A, Kindred Aff. at ¶ 4) The governing body of the Authority is the DCH Healthcare Authority Board of Directors (the "Board"). (*Id*. at ¶ 1; Ala. Code § 22-21-316). Defendant Kindred is employed by the Authority as its President and Chief Executive Officer. (DCH Ex. A, Kindred Aff. at ¶ 1) Defendant Stewart is employed by the Authority as Administrator of DCH Northport and as Executive Vice President of the Authority. (DCH Ex. B, Stewart Aff. at ¶ 1) Defendant Cassels is employed by the Authority as Administrator of DCH Regional Medical Center and as Executive Vice President of the Authority. (DCH Ex. C, Cassels Aff. at ¶ 1).

The AOSC is a professional corporation organized and existing under the laws of the state of Alabama. (AOSC Ex. 1, Barrineau Aff. at ¶ 3). Doctors Barrineau, Sudduth, Bassett and Krauss are shareholders and employees of AOSC. (AOSC Exhibits 1, 2, 3, & 4, Affidavits of Drs. Barrineau, Suddeth, Bassett and Krauss). The physicians affiliated with AOSC perform a majority of their services at facilities owned and operated by the Authority, i.e., either DCH Regional Medical Center or DCH Northport. In fact, the AOSC physicians represent over 60% of DCH Northport's surgical case volume. (DCH Ex. B, Stewart Aff. at ¶ 22).

The plaintiff, Dr. Mangieri, is an anesthesiologist who, in the early part of 1986, entered into a contract with West Alabama General Hospital, a privately owned and operated facility located in Northport, Alabama, granting him the exclusive right to provide

3

anesthesia services at that facility. (Plf. Ex. 1, Mangieri Depo., pp. 24-25, 33). On or about May of 1992, West Alabama General Hospital was acquired by the Authority and subsequently renamed DCH Northport. (Plf. Ex. 2, Mangieri Aff. at ¶ 5). This acquisition apparently did not effect Dr. Mangieri's ability to provide anesthesia services at the Northport facility and, on December 31, 1995, Dr. Mangieri, on behalf of E.A. Mangieri, M.D., P.C., Anesthesiology and Pain Management ("Mangieri Group"), entered into a contract with the Authority granting the Mangieri Group the exclusive right to provide anesthesia services at DCH Northport and to medically direct, through the anesthesiologists it employed, the certified registered nurse anesthesists ("CRNAs") employed by DCH Northport. (DCH Ex. B, Stewart Aff. at ¶ 5, ex. 1). The December 31, 1995, contractual agreement provided that its term would be for three years, from January 1, 1996 through December 31, 1998, and that, unless either party notified the other, no later than June 30, 1998, of its intention not to renew it, the contract would be automatically renewed for an additional two year term to December 31, 2000. (*Id.*).

In January of 1996, just after the parties entered into the three year contractual agreement, the Authority began to retreat from its previous commitment to maintain DCH Northport as a general acute care facility. (Plf. Ex. 2, Mangieri Aff. at ¶ 5, ex. B). Specifically, the Authority proposed to consolidate rehabilitation and psychiatric services at DCH Northport and to move all inpatient medical and surgical services from DCH Northport to nearby DCH Regional Medical Center. (Plf. Ex. 2, Mangieri Aff. at ¶ 6). Dr. Mangieri participated in forum meetings between physicians and administrators from both DCH Regional Medical Center and DCH Northport during which he vocally opposed any

4

changes that would compromise DCH Northport's mission as a general acute care facility. (*Id.* at ¶ 7). In fact, along with approximately fifty other local physicians, Dr. Mangieri signed a letter, subsequently published in *The Tuscaloosa News*, stating that the proposed changes were "not in the best interests of our patients." (Plf. Ex. 2, Mangieri Aff. at ¶ 8, ex. C). In addition to openly criticizing the Authority's proposed changes, Dr. Mangieri contacted representatives of Quorum Health Group ("Quorum") to explore the possible purchase of the Northport facility through the creation of a joint venture between Northport physicians and Quorum. (Plf. Ex. 2, Mangieri Aff. at ¶ 10, ex. D, Local Physicians Hear Plan to Buy DCH," *The Tuscaloosa News*).

Immediately following the press reports of the possible Quorum-physician joint-venture, the Authority withdrew its plans to consolidate inpatient medical and surgical treatment at the DCH Regional Medical Center. (Plf. Ex. 2, Mangieri Aff. at ¶ 13, ex. C, "DCH Retreating from Plans to Cut Northport Service," *The Tuscaloosa News*). According to Dr. Mangieri, after speaking out against the Authority's proposal to limit medical services provided at DCH Northport, he began to receive, for the first time in his medical career, complaints from the Authority regarding the anesthesia services provided by his medical group. (Plf. Ex. 2, Mangieri Aff. at ¶ 14; DCH Ex. B, Stewart Aff. at ¶ 9, ex. 3).[3] The Authority, through Stewart, also complained to Dr. Mangieri about the alleged unprofessional conduct of Dr. Stillwell Hunt ("Dr. Hunt"), an anesthesiologist employed by the Mangieri Group.

---

[3] Specifically, by letter dated February 4, 1997, Stewart advised Dr. Mangieri that "various surgeons on staff" had raised concerns regarding: (1) the availability of the anesthesiologist in the operating room area while cases are in progress, (2) level of coverage, (3) problems in surgery start times, preferential treatment of scheduling some physicians, (5) scheduling of cases, and (6) inappropriate or unprofessional behaviors. (DCH, Ex. B at Ex. 3).

(DCH Ex. B, Stewart Aff. at ¶ 9, ex. 3, Bates # 131). On September 5, 1997, based in part on Stewart's letter, Dr. Mangieri terminated Dr. Hunt's employment with the Mangieri Group. (*Id.*; Plf. Ex. 2, Mangieri Aff. at ¶ 18, ex. E).

The termination of Dr. Hunt's employment, according to Dr. Mangieri, was not well taken by the AOSC physicians. On September 19, 1997, a number of AOSC physicians attended a meeting of the Authority's Contracts Committee in which they expressed concerns about Dr. Hunt's termination as well as "the delivery of future services with the remaining anesthesiologists on staff." (Plf. Ex. 3, Bates # 134). While the Contracts Committee declined to discuss the details of the Mangieri Group's contract, and emphasized that a surgeon's preference for one anesthesiologist over another was not relevant to the implementation and enforcement of an existing contract, the committee recommended that legitimate concerns regarding the quality of care rendered by a fellow physician should be addressed through the corrective action process set forth in the medical staff bylaws. (*Id.*).

According to Dr. Mangieri, following the Contracts Committee meeting, Doctors Barrineau, Suddeth, Bassett and Kraus, members of AOSC, "bombarded" the Authority with frivolous and inaccurate complaints regarding the anesthesia services provided by the Mangieri Group. (Plf. Ex. 2, Mangieri Aff. at 18, ex. F; Plf. Ex. 1, Mangieri Depo. at pp. 79-80). The Authority, through Kindred, gave notice on March 18, 1998, of its intent not to renew the parties' contractual agreement. (Plf. Ex. 1, Mangieri Depo., p. 80; Plf. Ex. H, letter of March 17, 1998; DCH Ex. B, Stewart Aff. at ¶ 6).

6

In June of 1998, the Authority, through Stewart, sent written requests to six anesthesiology groups, including the Mangieri Group, for proposals to provide anesthesia services at DCH Northport.  (DCH Ex. B, Stewart Aff. at ¶ 7, ex. 2).  After evaluating the proposals submitted, and reviewing comments from members of the medical staff and primary surgeon groups, Stewart forwarded a memo to Kindred recommending that the Authority contract with Anesthesia Services of Birmingham, P.C.  (DCH Ex. B, Stewart Aff. at ¶ 8, ex. 2).  Notwithstanding Stewart's recommendation, on September 23, 1998, the Board met and voted to offer the Mangieri  Group a one year contract which, among other things, would contain a clause that if the contract was not renewed at the end of the year, Dr. Mangieri's anesthesia and pain privileges, along with those of other physicians in his group, would be relinquished.  (DCH Ex. A, Kindred Aff. at ¶ 10, ex. 2).

On October 1, 1998, a contract was entered into by and between the Authority and the Mangieri Group which granted to the Mangieri Group the exclusive right to provide anesthesia services at DCH Northport and to medically direct, through the anesthesiologists it employed, the CRNAs employed by DCH Northport.  (DCH Ex. B, Stewart Aff. at ¶ 10, ex. 2)  The contract provided for a one year term (January 1, 1999 - December 31, 1999) and it did not contain a renewal clause.  (DCH Ex. B, Stewart Aff. at ¶ 11, ex. 4 at ¶ 29).  The contract also provided that, in performing its duties and obligations under the agreement, the Mangieri Group and its MDAs were independent contractors as opposed to agents or employees of DCH Northport or the Authority.  (DCH Ex. B, Stewart Aff. at ¶ 11, ex. 4 at ¶ 32).  The contract further provided that only the parties to the agreement, the Mangieri Group and the Authority, had the right to enforce the terms of the agreement; third-party

beneficiaries were specifically excluded. (DCH Ex. B, Stewart Aff. at ¶ 11, ex. 4 at ¶ 37).

Finally, as a condition precedent to the agreement, all physicians employed by the Mangieri

Group were required to agree, in writing, to the automatic relinquishment of their medical

staff privileges upon the expiration or termination of Mangieri Group - Authority agreement.[4]

(DCH Ex. B, Stewart Aff. at ¶ 12, ex. 4 at "Exhibit 'A-1'"). While Dr. Mangieri understood the

terms of the agreement, and signed the agreement with the advice of counsel, he maintains

that the contract was presented as a "take it or leave it" offer. (Plf. Ex. A, Mangieri Depo.

p. 41).

On January 28, 1999, just after the effective date of the parties' one-year contractual

agreement, the Authority proposed a new set of medical staff bylaws[5] for the medical staff's

approval. (*Id.* at pp. 92-100). According to Dr. Mangieri, the DCH Northport medical staff

was not given prior notice of the proposed amendments and, therefore, did not have an

opportunity to have the proposal reviewed by legal counsel. (*Id.* at pp. 92-100). For this

reason, Mangieri moved to table the bylaws pending a qualified legal opinion by a health

care attorney representing the legal interests of the medical staff. (*Id.* at pp. 97-98). Dr.

Suddeth, an AOSC physician and one of Dr. Mangieri's critics, seconded Dr. Mangieri's

motion to table the bylaws. (*Id.* at p. 96). In fact, the entire DCH-Northport medical staff

supported Dr. Mangieri's opposition of the bylaws and elected him to serve as Chairman

---

[4] The contract required, upon termination of the relationship, the relinquishment of privileges at all DCH owned and operated facilities. (DCH Ex. B, Stewart Aff. at ¶ 12, ex. 4 at "Exhibit 'A-1'"). The clause also provided that if a physician's employment with the Mangieri Group ends for any reason, his or her medical staff privileges shall be automatically relinquished. (*Id.*).

[5] Generally speaking, the medical staff bylaws constitute a binding agreement between a hospital's medical staff and its board of directors. The bylaws define the medical staff's organizational structure, rights and responsibilities, as well as the medical staff's relationship with the hospital and its governing board.

of an ad hoc Medical Staff Bylaws Review Committee. (Plf. Ex. A, Mangieri Depo. pp. 97-98, 104). Dr. Suddeth also served on this committee (*Id*. at p. 98).

The disagreement over the bylaws centered around the power of the doctors to make certain decisions regarding credentialing of new medical staff, as opposed to allowing the hospital to make those decisions, as well as allowing the hospital to grant exclusive contracts for the provision of certain services without input from the medical staff. (*Id*. at pp. 153, 160, 164-65). The proposed bylaws, according to Mangieri, threatened to undermine patient care by requiring abdication of medical staff autonomy. (Plf. Ex. 2, Mangieri Aff. at ¶ 26). In meetings that occurred throughout the summer and fall of 1999, Mangieri frequently opposed the medical staff bylaws advocated for adoption by the Authority. (*Id*. at ¶ 27).

In 1998 and 1999, DCH Northport and the Authority received ongoing complaints and expressions of concern from members of the hospital medical staff regarding availability of anesthesiologists, later start times for surgeries due to late arrival of anesthesiologists, proficiency of anesthesiologists, and lack of harmony between Dr. Mangieri and the Administration. (DCH Ex. B, Stewart Aff. at ¶¶ 9, 13, 25, 16, 17, 18, 25 and exhibits referenced therein). On October 5, 1999, by memo, Stewart solicited comments from the DCH Northport Staff regarding the anesthesia services being provided by the Mangieri Group. (DCH Ex. B, Stewart Aff. at ¶ 19). Of the twenty-three physicians who responded to Stewart's request for comments, seventeen physicians were in favor of retaining the Mangieri Group while six physicians recommended that the Authority contract with another provider of anesthesia services. (DCH Ex. B, Stewart Aff. at ¶¶ 20-21, ex. 13). Notably, the

9

six physicians opposed to renewing the contract with the Mangieri Group, all members of AOSC or Obstetrics & Gynecology of West Alabama, P.C., performed roughly 63% of the DCH Northport surgical cases in 1998-1999 and 66% of the surgical cases in 1997-1998. (DCH Ex. B, Stewart Aff. at ¶ 22, ex. 13).

On October 7, 1999, Stewart sent requests, to six separate anesthesiology groups, for proposals to provide anesthesia services at DCH Northport, commencing January 1, 2000. (DCH Ex. B, Stewart Aff. at ¶ 20). Stewart and Kindred interviewed representatives from each of the four anesthesiology groups that submitted proposals, including the Mangieri Group. (*Id.* at ¶ 24). The Executive Committee of the Board met on November 8, 1999, and received Stewart's report on the responses to the requests for proposals to provide anesthesia services at DCH Northport. (*Id.* at ¶ 25). During the course of the meeting, Kindred, as President and CEO of the Authority, and Stewart, as Administrator of DCH Northport, recommended against awarding the anesthesia contract to the Mangieri Group. (DCH Ex. B, Stewart Aff. at ¶ 25, ex. 14; DCH Ex. A, Kindred Aff. at ¶ 16, ex. 5). The Executive Committee voted to recommend to the full Board, on November 9, 1999, that the Authority contract with Anesthesia Services of Birmingham, P.C., to provide anesthesia services at DCH Northport commencing on January 1, 2000. (DCH Ex. A, Kindred Aff. at ¶ 17, ex. 6.). On November 9, 1999, the full Board received and accepted the recommendation of the Executive Committee. (*Id.*).

Since the Authority decided against contracting with the Mangieri Group, pursuant to the terms of the parties' January 1, 1999, agreement, Dr. Mangieri was required to relinquish his medical staff privileges and, as of the date briefs were submitted, has yet to

10

obtain staff privileges at another hospital.  On March 3, 2000, Dr. Mangieri brought suit against the collective defendants alleging that the Authority, acting in concert with the private AOSC defendants, refused to "renew," on or about December 31, 1999, the exclusive contract with his medical group in retaliation for his speaking out about matters of public concern and in violation of his right to free speech as guaranteed under the First Amendment to the United States Constitution.   Additionally, invoking this court's supplemental jurisdiction, Dr. Mangieri alleges that the AOSC intentionally interfered with his business relationship with the Authority in violation of the laws of the state of Alabama.

**III.    Standard of Review**

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23.  There is no requirement, however, "that the moving party

11

support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Id.* at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id*. at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party

12

must prevail as a matter of law." *Id*. at 251-52; *see also Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 746 n.11 (1983) (indicating the standard for summary judgment is "[s]ubstantively . . . very close" to that for motions for directed verdict). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989).

Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are functions of the jury, and, therefore, "[t]he evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## IV.   Discussion

### A.   Standing

As a threshold matter, the court must determine whether Dr. Mangieri, in his individual capacity as sole shareholder of the Mangieri Group, has standing to pursue the allegations of the First Amended Complaint ("Complaint"). Standing is a jurisdictional

13

question, and the federal courts are under an independent obligation to analyze their own jurisdiction.[8] *Engineering Contrs. Ass'n v. Metropolitan Dade County*, 122 F.3d 895, 903 (11th Cir. 1997), *cert. denied*, 523 U.S. 1004, 118 S. Ct. 1186, 114 L. Ed. 2d 317 (1998). In order to acquire standing, a plaintiff must have a "personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for the illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204, 82 S. Ct. 691, 703, 7 L. Ed. 2d 663 (1962). The Supreme Court has treated standing as consisting of two related components: (1) the constitutional "case and controversy" requirements of Article III, and (2) prudential considerations that limit the exercise of jurisdiction in certain actions. *Warth v. Seldin*, 422 U.S. 490, 498, 95 S. Ct. 2197, 2204, 45 L. Ed. 2d 343 (1975).

In order to satisfy the Article III constitutional requirements, the plaintiff must show: (1) that he or she has suffered an actual or threatened injury, (2) that the injury is fairly traceable to the challenged conduct of the defendant, and (3) that the injury is likely to be redressed by a favorable ruling. *See Saladin v. Milledgeville*, 812 F.2d 687, 690 (11th Cir. 1987). Additionally, under the prudential considerations of the standing doctrine, considerations designed to "ensure the proper role of the courts in our tripartite system of government by avoiding judicial resolution of abstract questions," *Harris v. Evans*, 20 F. 3d 1118, 1121 (11th Cir. 1994), the court must consider: "(1) whether the plaintiff's complaint falls within the zone of interests protected by the statute or constitutional provision at issue;

---

[8]The court notes that standing cannot be waived and may be asserted at any stage of litigation. *Church of Scientology Flag Serv. Org. v. City of Clearwater*, 777 F.2d 598, 606 (11th Cir. 1985), *cert. denied*, 476 U.S. 1116, 106 S. Ct. 1973, 90 L. Ed. 2d 656 (1986).

(2) whether the complaint raises abstract questions amounting to generalized grievances which are more appropriately resolved by the legislative branches; and (3) whether the plaintiff is asserting his or her own legal rights and interests rather than the legal rights and interests of third parties. *Id.* (citing *Saladin*, 812 F.2d at 690). Relying upon this third and final prudential requirement, the defendants take the position that plaintiff is asserting the rights of a third party and, therefore, lacks standing to pursue this cause. As described in detail below, the court tends to agree with defendants.

In Count I of the Complaint, Dr. Mangieri alleges that, in retaliation for his vocal opposition to certain administrative functions of the Authority, the Authority refused to "renew" his exclusive services contract and revoked his privilege to practice medicine in any medical facilities owned/operated by the Authority. (*Complaint* at ¶¶ 8-12). In Count II of the Complaint, Dr. Mangieri contends that, in retaliation for his public statements, the private defendants (AOSC and its members) acted jointly with the Authority to ensure that his contract would be "non-renewed." (*Id.* at ¶¶ 13-14). Finally, in Count III of the Complaint, Dr. Mangieri alleges that the AOSC defendants intentionally interfered with his business/contractual relationship with the Authority. (*Id.* at ¶¶ 17-19). However, as pointed out by the defendants, the contract to which Dr. Mangieri refers is not a contract to which Dr. Mangieri, in his individual capacity, was a party. To the contrary, the contract in question was entered into by and between the Authority and E.A. Mangieri, M.D., P.C. Anesthesiology and Pain Management ("Mangieri Group").

It is well settled that, pursuant to the so called "shareholder standing" rule, "[a]n action to redress injuries to a corporation cannot be maintained by a shareholder in his own

15

name but must be brought in the name of the corporation." *Stevens v. Lowder*, 643 F.2d 1078, 1080 (5th Cir. 1981);[7] *Ex parte ReLife,* 679 So. 2d 664 (Ala. 1996) ("It has long been settled that '[a] corporation, just like an individual, must enforce its own rights and privileges'") (citations omitted). This shareholder standing rule applies even if the plaintiff is the sole shareholder of the corporation. *See Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc*., 862 F.2d 597, 603 (6th Cir. 1988) (holding that an action to redress injuries to a corporation cannot be maintained by a stockholder in his or her name, even where the individual is the sole stockholder); *Schaffer v. Universal Rundle Corp*., 397 F.2d 893, 896 (5th Cir. 1968) (explaining that a "stockholder's rights are merely derivative and can be asserted only through the corporation" and that this "rule is applicable in cases where the individual is the sole shareholder"). Notably, the shareholder standing rule is also applicable to civil rights actions brought pursuant to § 1981 or § 1983, alleging injury to the corporation in which one owns shares. *Gregory v. Mitchell*, 634 F.2d 199, 202 (5th Cir. 1981); *Bellows v. Amoco Oil Co.*, 118 F.3d 268, 276-277 (5th Cir. 1997); *Flynn v. Merrick*, 881 F. 2d 446, 449-450 (7th Cir. 1989).

In the present matter, Dr. Mangieri, in his individual capacity, seeks to recover losses allegedly incurred in connection with the termination/expiration of the services contract between the Mangieri Group and the Authority. The defendants argue, and the court agrees, that Dr. Mangieri's alleged injuries (loss of income and loss of medical staff privileges) are not separate and independent injuries, but are instead derivative of any

---

[7] In *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1,1981.

injuries suffered by the Mangieri Group. For this reason, the Mangieri Group is the only "real party in interest"[8] and, therefore, the only entity with standing to pursue the claims asserted. The court's analysis, however, does not end here.

Notwithstanding his defective pleadings, Dr. Mangieri takes the position that the defect could be readily corrected by permitting his anesthesia practice group, the Mangieri Group, to join in and/or ratify this lawsuit. (Plf. Response at p. 24); Fed. R. Civ. P. 17(a) ("No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a *reasonable time* has been allowed after objection for *ratification* of commencement of the action by, or joinder or substitution of . . . the real party in interest . . . .") (emphasis added). According to the Advisory Committee Note, "the modern purpose of the rule in its negative aspect is simply to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata." *Id.* (Advisory Committee Note). In an affidavit submitted in opposition to defendants' motion for summary judgment, Dr. Mangieri states:

> I am the Chief Executive Officer, President, Medical Director, and sole shareholder of E. A. Mangieri, M.D., P.C., Anesthesiology and Pain Management, P.C. (hereinafter "Mangieri P.C."). I understand that the defendants have raised in the complaint that I do not have standing to bring suit because the complaint was not filed in the name of the Mangieri, P.C. Accordingly, as CEO and President of Mangieri, P.C. I, acting in my capacity as Chief Executive

---

[8]"The concept of real party in interest is akin to the concept of standing, in that both address a party's right to pursue an action as a claimant. Generally, real parties in interest have standing, but not every party who meets standing requirements is a real party in interest." 4 Moore's Federal Practice, § 17.10[1] (Matthew Bender 3d ed.).

17

> Officer and President of Mangieri P.C. herein designate myself,
> Eugene A. Mangieri, as its lawful representative to prosecute
> this matter on behalf of the P.C. pursuant to paragraph 35 of the
> P.C.'s 1995 and 1998 contracts with the Authority.

(Plf. Ex. 2, Mangieri Aff. at ¶ 2).

In response to the proposed ratification, the collective defendants argue that, even if the Mangieri Group consents to this lawsuit, the § 1983 claims would not be sustainable because the Mangieri Group, as a corporate entity, has no constitutionally protected right to free speech. The defendants additionally argue that the real party in interest was obvious at the time this lawsuit was commenced and, pursuant to the court's Rule 16(b) scheduling order, the deadline for adding, deleting or substituting parties has long since expired. For the reasons that follow, the court finds the defendants' arguments unpersuasive.

As to their contention that a corporate entity has no constitutionally protected right to free speech, the court simply cites the defendants to *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 98 S. Ct. 1407, 55 L. Ed. 2d 707 (1978) (recognizing that the First Amendment prohibits the government from suppressing the affirmative speech of corporations; Court notes "[t]he inherent worth of the speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual") and *O'Hare Truck Serv. v. City of Northlake*, 518 U.S. 712, 116 S. Ct. 2353, 135 L. Ed. 2d 874 (1996) (indicating that the government may not terminate or decline to renew an independent contractors relationship to retaliate against the contractor for the exercise

18

of protected speech).[9] With respect to their second argument, based upon a review of each party's submissions, the court is convinced that nothing in this lawsuit, including the real party in interest, is or was "obvious" to either the plaintiff or the defendants. What is obvious, however, is that both parties have stumbled into an ever evolving and increasingly complicated area of constitutional law. *See* Rule 17(a) (Advisory Committee Note) (language in Rule 17 allowing a party to cure a real party in interest defect before the case is dismissed for failure to sue in the name of the real party in interest "is intended to prevent forfeiture when determination of the proper party to sue is difficult or when an understandable mistake has been made"). Given that ratification will neither alter nor otherwise effect the operative facts, issues, and causes of action, and given that defendants have failed to demonstrate that any prejudice would result from the proposed ratification, the court will construe the affidavit of Dr. Mangieri, as CEO and President of the Mangieri Group, as indicating consent or ratification of this lawsuit by the Mangieri Group. The court specifically notes that the ratification operates as *res judicata* as to any and all subsequent claims by the Mangieri Group arising out of the present cause.

**B.     Section 1983 Claims**

To obtain relief under 42 U.S.C. § 1983, a plaintiff must allege the deprivation of a right secured under the Constitution or federal law, and demonstrate that the alleged

---

[9] In *O'Hare Truck Serv.*, a § 1983 free speech claim was brought by the independent contractor, O'Hare Truck Services Inc., the party injured by the alleged retaliation, and the owner/operator of the corporation, John Gratzianna. *O'Hare Truck Serv.*, 518 U.S. at 715, 116 S. Ct. 2353. The distinction between the company and its owner/operator for the purposes of applying the standing rules was neither raised nor discussed. *See id.* Notably, in his dissenting opinion criticizing the extension of free speech rights to independent contractors, Justice Scalia recognized that, while "[a] public employee is always an individual . . ., [a] public contractor . . . is *usually a corporation.*" *Id.* at 2366. (emphasis added).

19

deprivation occurred under "color of state law." 42 U.S.C. § 1983; *Motes v. Myers*, 810 F.2d 1055, 1058 (11th Cir. 1987). It is well settled that, under § 1983, there is no *respondeat superior* liability. *Monell v. Department of Social Servs.*, 436 U.S. 658, 691-694, 98 S. Ct 2018, 56 L. Ed. 2d 611. Therefore, a municipality may not be sued under § 1983 for the acts of others but, rather, only for its own acts. *Id.*; *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988). In *Brown v. City of Fort Lauderdale*, 923 F.2d 1474 (11th Cir. 1991), the Eleventh Circuit reiterated that municipality liability may attach if the plaintiff can establish: (1) "a widespread practice that, although not authorized by written law or express municipal policy, causes a constitutional deprivation and is so permanent and well settled as to constitute a custom and usage with the force of law," or (2) that the alleged constitutional injury was caused by a person(s) who "possess[ed] final authority to establish municipal policy with respect to the action ordered." *Brown*, 923 F.2d at 1480-81 (internal citations omitted). With the foregoing principles in mind, the court turns to the allegations of Dr. Mangieri's complaint.

## 1.    § 1983 Claims against the Authority

Apparently predicating municipality liability under the second theory, described above, Dr. Mangieri alleges that the Authority, by and through its officers/directors,[10] refused to "renew" his medical group's anesthesiology contract on December 31, 1999, in retaliation for his speaking out about matters of public concern. At the outset, the court

---

[10]The court finds plaintiff's § 1983 claims against the individual defendants (Kindred, Stewart and Cassels) in their official capacities are redundant and, therefore, due to be dismissed. When an officer is sued under § 1983 in his or her official capacity, the suit is simply "another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985). "Such suits against municipal officers are therefore, in actuality, suits directed against the city that the officer represents." *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991).

20

notes that the Eleventh Circuit has previously recognized that the Authority is a "local government entity" subject to § 1983 liability. *Todorov v. DCH Healthcare Authority*, 921 F.2d 1438, 1462 (11th Cir. 1991). Moreover, it is settled law that the Authority, as a local government entity, may not discharge a public employee in retaliation for speech protected under the first amendment. *Martinez v. Opa-Locka*, 971 F.2d 708, 712 (11th Cir. 1992); *Bryson v. Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989). All parties agree, however, that Mangieri worked as an *independent contractor* for, rather than an employee of, the Authority. According to the Authority, as an independent contractor, Dr. Mangieri is not entitled to the first amendment protections afforded to government employees and, even if constitutional protections extend to government contractors, Dr. Mangieri's speech did not involve matters of public concern.

In a relatively recent pair of decisions handed down by the Supreme Court, *Board of County Commr's v. Umbehr*, 518 U.S. 668, 116 S. Ct. 2342, 135 L. Ed. 2d 843 (1996) and *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 116 S. Ct. 2353, 135 L. Ed. 2d 874 (1996), the rights of speech and association enjoyed by government employees were extended, subject to certain limitations and caveats, to government contractors. In *Umbehr*, the plaintiff was a trash hauler who entered into an exclusive contract with the county government to haul trash at a specified rate. *Umbehr*, 518 U.S. at 671. The contract provided for automatic annual renewal unless either party gave timely notice that the contract was to be terminated or renegotiated. *Id*. Pursuant to this contractual agreement, Umbehr hauled trash for six municipalities within the county from 1985 to 1991 without interruption. *Id*. After vigorously criticizing the Board of County Commissioners ("Board"),

21

and making an unsuccessful bid to become one of its members, the Board voted to terminate his trash hauling contract. *Umbehr*, 518 U.S. at 671.

Upon termination of his contract, Umbehr brought suit against the Board and its members, pursuant to 42 U.S.C. § 1983, alleging they had terminated his government contract in retaliation for his criticism. *Id*. at 672. The district court assumed that the contract was terminated in retaliation for his speech, but held that, as an independent contractor, Umbehr was not entitled to the First Amendment protection afforded to public employees. *Id*. (citing *Umbehr v. McClure*, 840 F. Supp. 837, 839 (D. Kan. 1993)). The United States Court of Appeals for the Tenth Circuit reversed the district court's dismissal, holding that Umbehr's speech was protected by the First Amendment in the same fashion that a government employee's speech is protected. *Id*. The Supreme Court granted certiorari to resolve the conflict among the circuits regarding whether, and to what extent, independent contractors are protected by the First Amendment. *Id*.

Justice O'Connor, writing for a seven-justice majority, began her analysis by noting the "obvious" similarities between government employees and government contractors. *Umbehr*, 518 U.S. at 674. With respect to both groups, the government has a strong interest in ensuring the efficiency, efficacy and responsiveness of service to the public and, absent contractual or constitutional restriction, is entitled to dismiss them for no reason at all. *Id*. However, the Court also recognized that "either type of relationship provides a valuable financial benefit, the threat of the loss of which in retaliation for speech may chill speech on matters of public concern by those who, because of their dealings with government, 'are often in the best position to know what ails the agencies for which they work[.]'" *Id*.

22

(quoting *Waters v. Churchill*, 511 U.S. 661, 674, 114 S. Ct. 1878, 1887, 128 L. Ed. 2d 686 (1994)). Rejecting the notion that the determination of constitutional protections should be based upon one's status as a government employee or government contractor, as well as the notion that offering free speech protection for government contractors "represents an unwarranted 'extension' of rights," the Court remanded the case for application of the *Pickering* balancing test to determine whether or not Umbehr's contract has been impermissibly terminated in retaliation for his speaking out on matters of public concern. *Id*. at 680-681, 685. Significantly, the Court concluded its opinion in *Umbehr* with the following caveat:

> Finally, we emphasize the limited nature of our decision today. Because Umbehr's suit concerns the *termination of a pre-existing commercial relationship with the government*, we need not address the possibility of suits by bidders or applicant's for new government contracts who cannot rely upon such a relationship.

*Id*. at 685 (emphasis added); *see also O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 116 S. Ct. 2353, 135 L. Ed. 2d 874 (1996) (holding that contractors, or "regular provider[s] of services," are entitled to same First Amendment protections as government employees; case remanded to district court with instructions to determine whether it was appropriate to apply *Elrod/Branti* rule regarding political affiliation or *Pickering* balancing test regarding free speech).

The present cause, as pled by the plaintiff, is neither *Umbehr* nor *O'Hare*. In or around December of 1995, Dr. Mangieri, acting on behalf of the Mangieri Group, entered into a three year contractual agreement with the Authority. Pursuant to that agreement, the

23

Mangieri Group enjoyed the exclusive right to provide anesthesia services at DCH Northport. By its terms, the contract was to *automatically renew* upon expiration unless either party terminated it by giving notice at least 180 days before expiration. (DCH Ex. B, Stewart Aff. at ¶ 5, ex. 1). On March 18, 1998, more than 180 days before the contract was to expire and, therefore, automatically renew, the Authority gave notice of its intention not to renew the parties' contractual agreement. Soon thereafter, the Authority began soliciting proposals from various anesthesiology groups, including the Mangieri Group, to provide anesthesiology services at DCH Northport. After evaluating the proposals submitted, the Authority, through its Board of Directors, elected to offer the Mangieri Group a one year contract that, in contrast to the party's prior contractual agreements, would *not contain an automatic renewal clause*. (DCH Ex. B, Stewart Aff. at ¶ 11, ex. 4 at ¶ 29). On October 1, 1998, Dr. Mangieri, with the advice of counsel, accepted the modified, one year contract on behalf of the Mangieri Group (effective January 1, 1999 - December 31, 1999).

On October 7, 1999, a few months before the parties' one year contract was to expire, the Authority, once again, solicited proposals to provide anesthesia services at DCH Northport, commencing January 1, 2000. Four anesthesiology groups, including the Mangieri Group (the then current contract holder), submitted proposals. The Executive Committee of the Board met on November 8, 1999, and voted to recommend to the full Board, on November 9, 1999, that the Authority award the contract to a group other than the Mangieri Group. The full Board received and accepted the recommendation of the Executive Committee. Since the Mangieri Group's proposal was not selected by the Board, the Mangieri Group-Authority contract expired, by its own terms, on December 31, 1999.

24

Based on these undisputed facts, the court cannot say that the Authority, by declining to accept the Mangieri Group's proposal, either terminated, or prevented the automatic renewal of, a "pre-existing commercial relationship" with a governmental entity. *See Umbehr*, 518 U.S. at 685. While the parties were undoubtedly engaged in an on-going relationship from December of 1995 until March of 1998,[11] that relationship ended when, on March 18, 1998, the Authority timely notified Dr. Mangieri of its decision to prevent the automatic renewal of his anesthesiology contract.[12] After the contract expired by its own terms in December of 1998, Dr. Mangieri was required to bid, along with other contractors, for a "new" DCH Northport anesthesiology contract. Through the bidding process, the Mangieri group was offered, and accepted, a one year modified contract that, among other things, did not contain a renewal clause. For this reason, unlike the contractors in *Umbehr* and *O'Hare*, the Mangieri Group had no assurances that its relationship with the Authority would continue beyond the one year contractual term.[13] Indeed, Dr. Mangieri's characterizations to the contrary notwithstanding, the Authority neither terminated nor

---

[11] Although the facts are not clear on the issue, it appears that the parties' on-going relationship may have commenced as early as May of 1992.

[12] On April 30, 2001, the court afforded the parties an opportunity to present oral argument on the motions currently pending before the court. During those proceedings, attended by counsel for each party, the court voiced concerns as to whether the plaintiff had correctly identified, in the pleadings, the unlawful retalitory act of which he complains. Specifically, the court inquired into whether the unlawful retaliation occurred: (1) in March of 1998 when the Authority's decision to prevent the automatic renewal of the parties' on-going contractual relationship was made and communicated to Dr. Mangieri; (2) in November of 1999, when his "bid" for a future contract was rejected; or (3) in December of 1999, when his one year contract "expired" by its own terms.

[13] Given that the Authority deleted the "automatic renewal clause" prior to offering plaintiff a one year contract, plaintiff's contention that "[t]here was no indication in October of 1998 that his contract would not be renewed" is curious. (Letter in response to court's inquiry, dated May 1, 2001).

declined to "renew" the Mangieri Group's 1998 -1999 contract; rather, the contract simply expired by its own terms on December 31, 1999.

In October of 1999, just before the one year contract was set to expire, the Mangieri Group, for the second time in as many years, submitted a proposal in hopes of being awarded the contract to perform future anesthesia services for DCH Northport. Because the Authority's decision to contract with someone other than the Mangieri Group does not "concern[ ] the termination of a pre-existing commercial relationship with the government," the court is convinced that Dr. Mangieri's retaliation claim is not cognizable under existing law. For this reason, without reaching parties' positions with respect to the proper application of the *Pickering* balancing test, summary judgment will be granted in favor of the Authority.

As a final note, the court is constrained to point out that, despite suggestive questioning during oral argument, Dr. Mangieri still insists that the act of alleged retaliation occurred either in November of 1999, when his proposal was rejected, or in December of 1999, when his contract expired and his staff privileges were revoked. However, the evidence before the court suggests that, if the parties were ever engaged in the type of relationship which would afford the Mangieri Group status to pursue a § 1983 free speech claim, the relationship ended with the Authority's decision, communicated to Dr. Mangieri in March of 1998, to prevent the automatic renewal of the parties' on-going contractual agreement. *See Umbehr*, 518 U.S. at 685. Dr. Mangieri has not requested permission to amend the complaint and the court does not reach the question of whether an amendment would be permitted at such a late date.

### 2.    § 1983 Claims against the AOSC

As noted above, Dr. Mangieri also contends that, in retaliation for his public statements, the private defendants (AOSC and its members) acted jointly with the Authority to ensure that his contract would be "non-renewed." *See Tower v. Glover*, 467 U.S. 914, 104 S. Ct. 2820, 2824, 81 L. Ed. 2d 758 (1988) ("an otherwise private person acts 'under color of' state law when engaged in a conspiracy with state officials to deprive another of federal rights") (citation omitted).   In *N.A.A.C.P. v. Hunt*, the Eleventh Circuit set out the requirements of a § 1983 conspiracy:

> The plaintiff attempting to prove such a conspiracy must show that the parties "reached an understanding" to deny the plaintiff his or her rights.   The conspiratorial acts must impinge upon the federal right; the plaintiff must prove an actionable wrong to support the conspiracy.

891 F.2d 1555, 1563 (11th Cir. 1990) (internal citations omitted).

Assuming, without deciding, that the collective defendants "reached an understanding" to deny plaintiff a constitutional right, as described in detail above, the plaintiff simply cannot establish an actual constitutional deprivation. *See Strength v. Hubert*, 854 F.2d 421 (11th Cir. 1984) (conspiratorial act must impinge upon federal right); *Villanueva v. McInnis*, 723 F.2d 414, 416 (5th Cir. 1984) ("it remains necessary to prove an actual deprivation of a constitutional right; a conspiracy to deprive is insufficient . . . [w]ithout a deprivation of a constitutional right or privilege, [the defendant] has no liability under § 1983").   In the absence of a deprivation of a protected right or privilege, his civil conspiracy claim must necessarily fail.   Summary judgment as to these claims will be granted in favor of the AOSC defendants.

27

## C.     State Law Claim

When a district court has dismissed all claims over which it has original jurisdiction, it may decline to exercise supplemental jurisdiction over other claims. 28 U.S.C. § 1367 (c)(3). Because the court exercises only supplemental jurisdiction over Dr. Mangieri's claim for intentional interference with business relations it will decline to exercise that jurisdiction in favor of jurisdiction in the courts of the State of Alabama. The statute of limitations with respect to this claim shall be tolled from the date of the filing of this lawsuit.

## V.     Conclusion

The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this ____31st____ of May, 2001.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE

28